

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

ELAD GROSS,                    )

                                   )

          Appellant,        )

                                   )

v.                           )       WD87007

                                   )

ERIC SCHMITT, ET AL.,     )       Opinion filed:  January 28, 2025

                                 )

         Respondents.    )

**APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY, MISSOURI**
**THE HONORABLE DANIEL R. GREEN, JUDGE**

Division Two:  Alok Ahuja, Presiding Judge,
Edward R. Ardini, Jr., Judge and W. Douglas Thomson, Judge

Elad Gross appeals the entry of summary judgment by the Circuit Court of Cole County ("trial court") in favor of Missouri Attorney General Eric Schmitt,[1] Acting General Counsel Justin Smith ("Smith"), and Records Custodian Megan Werdehausen ("Werdehausen") (collectively, the "AGO") on Gross's petition alleging the AGO violated Missouri's Sunshine Law[2] and Article I, Section 8 of the Missouri Constitution. Gross contends the trial court erroneously granted summary judgment and abused its discretion

---

[1] Eric Schmitt was the Missouri Attorney General from January 2019 to January 2023.

[2] Section 610.010 *et seq*. All statutory references are to the Revised Statutes of Missouri 2016.

by closing discovery through issuance of a protective order. We affirm the trial court's judgment.

## Procedural Background

This litigation arises from three Sunshine Requests submitted by Gross to the AGO in early 2021.[3] He submitted his first Sunshine Request ("first request") on January 11, 2021, seeking records related to "the Missouri AG's efforts to contest electoral college results[.]" In response, Werdehausen produced ninety pages of documents. Gross submitted a second Sunshine Request ("second request") on February 25, 2021, for "[a]ny and all emails, text messages, communications, or other records sent between Missouri Attorney General Eric Schmitt and other states' Attorneys General or staff dating since January 2019." Werdehausen's response to the second request indicated that the AGO had "no records responsive to his request." On March 5, 2021, Gross submitted a third Sunshine Request ("third request") seeking "[e]mails, search records, and any other records showing how the Missouri Attorney General's Office searched for records and in what locations" when responding to Gross's first request. Werdehausen indicated that records responsive to the third request were closed under section 610.021(1) RSMo.

In April of 2021, Gross[4] filed a four-count petition against Attorney General Schmitt, Smith, and Werdehausen. Counts I, II, and III asserted that the AGO violated the

---

[3] As some of Gross's points on appeal concern the trial court's grant of summary judgment in favor of the AGO, we will provide more specific details of the uncontroverted material facts contained in the Rule 74.04(c) summary judgment record during our review of those points.

[4] Gross is a licensed attorney in the State of Missouri and has represented himself in this litigation.

Sunshine Law.[5] Count IV alleged the AGO denied Gross access to open records based on public statements made by Gross that were critical of the "Office of Attorney General" and that the AGO's action violated the Missouri Constitution's "protection of free speech and prohibition of retaliation[.]"

The AGO served upon Gross its Request for Production of Documents ("RFP") on August 30, 2021. Gross responded in part but objected to RFP No. 10 ("RFP 10") which sought "all Documents and Communications with any third parties that relate in any way to [Gross's] Sunshine requests or this lawsuit," by asserting that responsive documents were protected by the attorney/client privilege.

The AGO filed a Motion to Compel requesting that Gross be ordered to produce documents responsive to RFP 10. In its motion, the AGO challenged Gross's claim of attorney/client privilege by noting that Gross was "acting pro se and has failed to give [the trial court] or Defendants any evidence to the contrary." Following a hearing, Gross was ordered to produce records responsive to RFP 10. Gross produced links to articles written about his "investigation" into the AGO; links to radio interviews and podcasts where Gross was a guest; and links to a collection of statements Gross made on his Twitter account (now, X). All of this information was publicly disseminated content that did not constitute

---

[5] Count I alleged the AGO violated Chapter 610 by improperly closing records responsive to Gross's third request. Count II alleged the AGO violated Chapter 610 by failing to produce records related to Gross's first request by "the earliest time and date." Count III alleged the AGO failed to "provide a detailed explanation of the cause for delaying production of public records" responsive to Gross's first request.

3

attorney-client communication. The same day he provided his supplemental response to RFP 10, Gross requested dates to conduct the depositions of Smith and Werdehausen.

The AGO filed a Motion for Protective Order requesting the trial court sanction Gross for his "abuse of the discovery process[]" arguing that Gross's discovery-related conduct "ha[d] wasted (and will continue to waste) the State's and the Court's time and resources." By example, the AGO highlighted Gross's actions related to RFP 10 by arguing that Gross either "wrongfully withheld responsive documents" or "is wasting the State's and the Court's time on bad-faith arguments." The AGO additionally questioned Gross's motives underlying his request for deposition dates for Smith and Werdehausen, explaining that the AGO had "previously provid[ed] [deposition] dates in November and December 2021 but [had] not hear[d] a word from [Gross]."

The trial court held a hearing on the AGO's Motion for Protective Order on February 28, 2022. Gross has not included a transcript of this hearing in the record on appeal.[6] On October 24, 2022, the trial court granted the AGO's motion by entering a protective order closing discovery. The order stated:

> Before the Court is Defendants' Motion for Protective Order, filed on February 23, 2022, which requests that the Court order discovery closed. Having fully considered the parties' pleadings, evidence, written arguments, and oral arguments,

---

[6] The only information provided to this Court related to this hearing is found in a single docket-entry indicating the trial court took the Motion for Protective Order under advisement. Curiously, on March 3, 2022, Gross filed a Motion for the Court to Reconsider its Order Requiring Depositions by Written Questions. However, the record includes no such order entered by the trial court. It appears from the AGO's opposition to Gross's motion to reconsider that during the hearing on the Motion for Protective Order the trial court may have "suggested that [Gross] could depose Defendants Smith and Werdehausen via written questions in lieu of oral testimony." No order to that effect was ever issued based on our review of the record that Gross has provided to us.

4

> Defendant's motion for protective order is granted. Discovery is closed.

The AGO moved for summary judgment on all four counts of Gross's petition on April 10, 2023. Gross failed to file a response to this motion. Instead, on May 22, 2023, he filed a Motion to Strike Defendant's Motion for Summary Judgment[7] and requested the trial court conduct an *in camera* review of the records responsive to Gross's third request. On January 19, 2024, the trial court entered summary judgment in favor of the AGO on all counts.[8]

This appeal follows.

**Analysis**

Gross raises twelve points on appeal. His first six points contend the trial court erred by granting summary judgment in favor of the AGO. The remainder of Gross's points (Points VII through XII) assert the trial court abused its discretion by "prematurely" closing discovery. As our review of Points VII through XII concern facts outside the summary judgment record, we will review those points first for ease of discussion.

---

[7] Gross argued that the trial court should strike the AGO's Motion for Summary Judgment because it was "untimely." His memorandum in support of this motion restated this argument, but provided no law in support of it – stating simply that he had "filed a writ petition with the Western District Court of Appeals seeking to reopen discovery."

[8] The trial court also denied Gross's motion to strike and request for *in camera* review of documents.

*No Abuse of Discretion by the Trial Court in Granting*
*Protective Order and Closing Discovery*
*(Points VII – XII)*

The trial court entered its protective order closing discovery pursuant to Rule

56.01(c),[9] which provides that:

> Upon motion by a party or by the person from whom discovery
> is sought, including e-discovery, and for good cause shown, the
> court may make any order which justice requires to protect a
> party or person from annoyance, embarrassment, oppression,
> or undue burden or expense[.]

A trial court's enforcement of the rules of discovery is reviewed for an abuse of discretion.

*See Morphis v. Bass Pro Group, LLC*, 518 S.W.3d 259, 261 (Mo. App. S.D. 2017).

> Trial courts have broad discretion in administering rules of
> discovery, which this Court will not disturb absent an abuse of
> discretion. When reviewing the trial court's decision regarding
> issues arising from pre-trial discovery, of which appellate
> courts grant trial court decisions great deference, we look only
> for an abuse of this broad discretion which results in prejudice
> or unfair surprise.

*Rasmussen v. Ill. Cas. Co.*, 628 S.W.3d 166, 172 (Mo. App. W.D. 2021) (internal marks

and citations omitted). "The circuit court abuses its discretion in administering the

discovery rules when its ruling is clearly against the logic of the circumstances, is arbitrary

and unreasonable, and indicates a lack of careful consideration." *Main v. Main*, 685 S.W.3d

620, 631 (Mo. App. E.D. 2024) (internal marks omitted).

Points VII through XII each relate in some manner to the trial court's closing of

discovery through the granting of the AGO's Motion for Protective Order. However, in his

---

[9] All Rule references are to the Missouri Supreme Court Rules 2022, unless otherwise noted.

argument in support of each of these points, Gross fails to address (or acknowledge) that the protective order was entered by the trial court as a sanction for his conduct during the discovery process. Indeed, the Motion for Protective Order was filed after the trial court had compelled Gross to produce documents that he had withheld on a claim that they were privileged attorney-client communication. Despite this assertion, Gross "produced several URLs to public websites . . . but *zero* documents" containing any "communications." As a result, the issue is not, as Gross wishes to cast it, whether he was pursuing properly discoverable material through an effort to depose Smith and Werdehausen. Rather, the question is whether the trial court abused its discretion by closing discovery as a sanction for Gross's conduct during the discovery phase of the litigation.

As previously noted, Gross has not provided us with a copy of the transcript of the hearing on the Motion for Protective Order. "The record on appeal shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented, by either appellant or respondent, to the appellate court for decision. It is divided into two components: the legal file and the transcript." Rule 81.12(a). As the appellant, it was Gross's duty to provide this Court with a record sufficient to decide the issues he raises in the appeal. Rule 81.12(c)(1). In the absence of a transcript of the hearing on the Motion for Protective Order, we are without a means to verify the evidence that was before the trial court. *See Voepel Prop. Mgmt. Inc. for Owner Isla Prop. Co., LLC v. Bates*, 647 S.W.3d 878, 879 (Mo App. W.D. 2022). More specifically, "[w]ithout a transcript we are unable to determine if there is a basis for concluding an alleged error occurred, whether such error was waived or invited, or even whether an alleged error resulted in manifest injustice[.]"

7

*Id*. Where an appellant fails to file a transcript, "such evidentiary omission will be taken as favorable to the trial court's ruling and unfavorable to the appellant." *Alhalabi v. Mo. Dept. of Corr.*, 662 S.W.3d 180, 192 (Mo. App. W.D. 2023). With this background and law in mind, we now turn to the specific challenges Gross raises on appeal relating to the granting of the AGO's Motion for Protective Order and closing of discovery.

We first address Points IX through XII. In these points, Gross challenges an order and findings of the trial court that are not included in the record on appeal. In Points IX and XII, Gross attacks a "*sua sponte* order" by the trial court that he claims required him to "depose [Smith and Werdehausen] only upon written questions" to avoid issuance of a protective order. Similarly, Points X and XI pertain to the trial court's "*sua sponte* find[ings]" that Smith and Werdehausen were "too busy to be deposed upon oral examination[.]" There is nothing in the record indicating the existence of either the "*sua sponte* order*" or "*sua sponte* findings" Gross challenges in these points.[10] Because the record on appeal does not contain the order or "findings" referenced by Gross, there is nothing for us to review. Therefore, we deny Points IX, X, XI, and XII.

Next, we consider Gross's contention in Point VII that the trial court's issuance of a protective order "was an unwarranted and extreme restriction" on his rights. Throughout his argument, Gross recharacterizes the nature of the protective order issued by the trial

---

[10] As indicated earlier, based upon the contents of the AGO's opposition to Gross's Motion to Reconsider the Trial Court's Order Requiring Depositions by Written Questions, we surmise that Gross is referring to comments possibly made by the trial court during the hearing on the Motion for Protective Order. However, due to Gross's failure to provide us with a transcript of that hearing, we are unable to confirm the basis of his assertions.

court – not as a sanction against him but rather as a usurpation of his right to depose Smith and Werdehausen by his preferred method of oral examination. Moreover, Gross incorrectly insists that the trial court lacked authority to issue a protective order based upon a requirement contained in an outdated version of the rule pertaining to protective orders. Indeed, Gross relies upon a requirement that is not found in Rule 56.01(c).[11] Point VII is denied.

Gross's next point (Point VIII) argues that he was entitled to orally depose Smith and Werdehausen because the AGO "failed to show good cause for why depositions must be taken only upon written questions." In support of this assertion, Gross argues the trial court failed to hold an evidentiary hearing prior to its entry of the protective order and did not provide "any reasoning" to support a finding of good cause "to prevent" him from deposing Smith and Werdehausen. We again emphasize that Gross ignores that the protective order was issued as a sanction for his conduct during the discovery process and

---

[11] Relying on *State ex rel. Houser v. Goodman*, 406 S.W.2d 121, 125-27 (Mo. App. 1966) for support, Gross argues that the trial court lacked the authority to issue a protective order because deposition notices had not been issued to Werdehausen and Smith, and therefore, the AGO's motion for a protective order was not seasonably made. *Houser* has no relevance here because it addressed a supreme court rule related to protective orders that no longer exists in the same form. At the time of *Houser*, Rule 57.01(c) stated, in relevant part:

> *After notice is served for taking a deposition*, upon motion seasonably made by any party or by the person to be examined and upon notice and for good cause shown, the court in which the action is pending may . . . make any other order which justice requires to protect the party or witness from annoyance, embarrassment, or undue expense, oppression, or to compel a witness or party to make discovery.

(emphasis added). Under the current applicable rule, the issuance of a deposition notice is not a condition precedent to the filing of a motion for protective order. Rule 56.01(c).

that the trial court did hold a hearing on the AGO's Motion for Protective Order. While we do not have the benefit of a transcript from that hearing, the trial court's order granting the protective order indicates that "evidence" was presented: "[b]efore the Court is Defendants' Motion for Protective Order, filed on February 23, 2022, which requests that the Court order discovery closed. Having fully considered the parties' pleadings, *evidence*, written arguments, and oral arguments, Defendant's motion for protective order is granted. Discovery is closed." (emphasis added).

Because Gross has not provided us the relevant transcript, we must view this omission favorable to the trial court's order and presume the "evidence" referenced in the trial court's order was sufficient to support issuance of the protective order. *See Alhalabi*, 662 S.W.3d at 192. Accordingly, we deny Point VIII.

*The Trial Court Did Not Erroneously Grant Summary Judgment in Favor Of the AGO*
*(Points I – VI)*

The remainder of Gross's points each maintain the trial court erroneously granted summary judgment in favor of the AGO on the four counts contained in Gross's petition. The standard of review applicable to summary judgment was laid out by the Missouri Supreme Court in *Green v. Fotoohighiham*, 606 S.W.3d 113, 116 (Mo. banc 2020):

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment de novo. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper. Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law.

10

> The facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. Only genuine disputes as to material facts preclude summary judgment. A material fact in the context of summary judgment is one from which the right to judgment flows.
>
> The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to the benefit of all reasonable inferences from the record. However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. In addition, the non-movant must support denials with specific references to discovery, exhibits, or affidavits demonstrating a genuine factual issue for trial. Facts not properly supported under Rule 74.04(c)(2) or (c)(4) are deemed admitted.

(internal marks and citations omitted).

Gross did not file a response to the AGO's Motion for Summary Judgment which resulted in the admission of the AGO's statement of uncontroverted facts. *See id*. at 117 (failure to respond to a motion for summary judgment results in "the admission to all . . . uncontroverted material facts."). Those uncontroverted facts are as follows:

**Plaintiff's First Sunshine Request**

1. On January 11, 2021, Plaintiff submitted the first of three Sunshine requests to the Attorney General's Office through the Sunshine and Government Accountability Project.

2. This request sought records from Defendants, including:

- Communications between the Missouri Attorney General's Office, the Republican Attorneys General Association, and the Rule of Law Defense Fund;

- Communications between the Missouri Attorney General's Office, the Republican Attorneys General

11

Association, and the Rule of Law Defense Fund regarding the 2020 presidential election, Missouri's amicus brief challenging Pennsylvania's election results, and the January 6, 2021 event at the United States Capitol;

- Calendar entries mentioning the Republican Attorneys General Association or the Rule of Law Defense Fund.

3. On January 14, 2021—three business days after the Attorney General's Office received Plaintiff's request—the custodian of records responded to Plaintiff's request in relevant part, "Your above-referenced records request was received by our custodian of records on January 11, 2021. Due to the dates and the volume of records to be searched, the earliest we expect responsive records, if any, to be available is January 28, 2021. In the event they are available earlier, we will provide them as soon as they are available."

4. The Attorney General's Office was not able to provide responsive records by January 28, 2021.

5. On February 3, 2021, the custodian of records updated Plaintiff on his request. Her letter stated in relevant part, "Due to our ongoing search for all records, and review of such records, the earliest we now expect responsive records to be available is February 19, 2021. In the event they are available earlier, we will provide them as soon as they are available.

6. On February 18, 2021, the Attorney General's Office provided 90 pages of responsive open public records to Plaintiff.

**Plaintiff's Second Sunshine Request**

7. On February 25, 2021, Plaintiff submitted his second request for public records, this time seeking correspondence between the Attorney General and other states' attorney general offices.

8. On March 3, 2021—three business days after the Attorney General's Office received Plaintiff's request—the custodian of records responded and informed Plaintiff that the Office had no responsive records to the request.

12

**Plaintiff's Third Sunshine Request**

9. On March 5, 2021, Plaintiff submitted his third request for public records, this time seeking records showing how the Attorney General's Office internally handled his first records requests. Specifically, Plaintiff sought: "Emails, search records, and any other records showing how the Missouri Attorney General's Office searched for records and what locations the Missouri Attorney General's Office searched in response to the Sunshine Request dated January 11, 2021 sent by attorney [M.P] on behalf of Elad Gross and the general public."

10. On March 10, 2021—three business days after the Attorney General's Office received Plaintiff's request—the custodian of records responded to it, informing Plaintiff that the records he sought were closed under § 610.021(1), RSMo.

11. On March 15, 2021, Plaintiff sent a letter to the Attorney General's Office asking it to reconsider its denial of his third records request.

12. Though no provision of the Sunshine Law required the Attorney General's Office to respond to Plaintiff's demand letter, on March 18, 2021, the Office's then-acting general counsel sent Plaintiff a four-page letter explaining the basis for closing records in response to Plaintiff's third Sunshine request.

13. On March 19, 2021, just one day after the Attorney General's Office sent its letter explaining the basis for its denial, Plaintiff replied with a letter attempting to refute the Office's interpretation of the Sunshine Law.

**@BigElad's Tweets about His Lawsuit Plans**

14. On February 23, 2021, Plaintiff, who calls himself @BigElad on Twitter, accused the Missouri Attorney General, via Twitter, of "[p]otential violation of public records laws."

15. This tweet includes a screenshot of a report by Plaintiff that states, in part:

13

> The emails received in response to [Plaintiff's] Sunshine Request reveal four categories of legal and ethical concern:
>
> …
>
> **Violation of Missouri's Public Records Law**
>
> Missouri's Sunshine Law, RSMo. Chapter 610, requires state entities to produce public records upon request. It appears that we only received emails from official email accounts, but the law does not limit production to such accounts. The email contents indicate we did not receive all of the material. We did not receive any calendar entries. We also did not receive any communications between Missouri's Attorney General and other state Attorneys General. Missouri's Attorney General notably does not use official email, but storing public records on private accounts does not nullify the Sunshine Law.

16. In Plaintiff's published report, referenced in the February 23, 2021 tweet, Plaintiff recommends, among other things, that someone, "Fully Investigate the Issues Identified in this Report."

17. On March 10, 2021, Plaintiff stated, via Twitter: "Missouri Attorney General Eric Schmitt won't turn over records related to the illegal use of taxpayer resources for political purposes in his office. I will do my best to educate him about the Sunshine Law, but if he refuses to follow the law, I'll ask a judge to make him."

18. On March 11, 2021, Plaintiff stated, via Twitter: "Let's try to find out. Today, I'm sending an explanation of the Sunshine Law to our Attorney General, a request that he provide a full reason for closing the records or that he reconsider, and, if all else fails, a notice of my pending lawsuit."

19. On March 15, 2021, Plaintiff stated, via Twitter: "Missouri's Attorney General shouldn't exempt himself from the laws he's supposed to enforce. Nor should he manipulate the Sunshine Law to hide records of corruption. It's the first

day of #SunshineWeek. We'll end this week with transparency or with a lawsuit. The choice is his."

20. On March 18, 2021, Plaintiff stated, via Twitter: "I gave Missouri's Attorney General until 10 AM today to stop using our Sunshine Law to hide records or I would take him to court. At 9:51, his office asked me to wait until the close of business today. I have granted him that request in the hopes my letter has changed his mind."

21. On April 8, 2021, Plaintiff wrote 17 posts on his Twitter account that, among other things, announced his lawsuit, explained his reasons for filing it, and published both the Attorney General's March 18th letter and his response.

22. Also on April 8, 2021, Plaintiff filed this lawsuit against the Attorney General, his chief of staff, and his custodian of records.

23. On August 30, 2021, Defendants submitted discovery requests to Plaintiff.

24. On September 29, 2021, Plaintiff responded to Defendants' discovery requests, objecting on multiple grounds.

25. After meeting and conferring, and without waiving his objections, on October 29, 2021, Plaintiff supplemented his response and produced 48 pages of documents.

26. On January 24, 2022, Plaintiff again supplemented his response to Defendants' discovery requests and produced web links to the original sources of online posts in the possession of third parties, including 5 news articles, 2 podcasts, 8 radio interviews, and 42 of his own tweets.

(record citations omitted).

15

The AGO provided a detailed explanation for the delay and
earliest time and date records would be available
(Points IV and V)

Gross's first request sought: "all emails between @ago.mo.gov and @republicanags.com" and "@RLDF.org" and "all calendar entries" that mentioned or referred to the Republican Attorneys General Association or Rule of Law Defense Fund, as well as "all communications, including but not limited to emails and text messages" between the Attorney General (including executive level employees) and "a) any other state's Attorney General, b) any employee or agent of the Republican Attorneys General Association, c) any employee or agent of the Rule of Law Defense Fund[,]" discussing "the Missouri amicus brief in support of the challenge to Pennsylvania's certification of electoral college votes, and/or the planned protests at the U.S. Capitol on January 6, 2021." The scope of time included in this request was from July 1, 2020, through January 11, 2021 (the day of his request).

Werdehausen timely informed Gross that the records he requested would not be immediately available "[d]ue to the dates and the volume of records to be searched" and provided an anticipated "production date" of January 28, 2021.[12] In his petition, Gross alleged the AGO violated the Sunshine Law by failing to provide him with a detailed explanation for the delay (Count III) and the "earliest time and date" the records would be

---

[12] Werdehausen sent a second communication to Gross informing him that the AGO needed additional time to process his request and that he should now expect to inspect the records responsive to his first request on February 19, 2021.

available to inspect (Count II). Gross contends that the trial court erroneously granted summary judgment in favor of the AGO on these counts.

When records are requested from a public governmental body under the Sunshine Law, the public governmental body is required to act upon the request within three business days. *See* § 610.023.3. If access to the public records is not possible in that timeframe, the public governmental body must provide the requestor with a "detailed explanation of the cause for further delay and the place and earliest time and date that the record will be available for inspection. This period for document production may exceed three days for reasonable cause." *Id*.

Gross argues in Point IV that summary judgment was improperly granted on Count II because the AGO did not produce responsive records by the "earliest time and date" initially declared by Werdehausen – January 28, 2021. Without citation to any relevant legal authority,[13] Gross proposes that the "earliest time and date" language in section 610.023.3 creates a firm deadline to produce responsive records. The language of section 610.023.3 does not compel such a strict reading.

---

[13] In the argument portion of his briefing, Gross quotes *Gross v. Parson*, to support his argument that a public governmental body must provide a requestor with "the exact calendar date upon which [the requestor] could inspect the requested records[.]" 624 S.W.3d 877, 889 (Mo. banc 2021) (estimate of 120 business days to produce records was not sufficient "earliest date and time" as required by section 610.023.3). Gross omits the first sentence of the quoted paragraph which states: "[t]he Governor's Office did not provide the 'earliest date and time' the records would be available for inspection *because it conditioned its response on Mr. Gross's payment of attorney review time*." *Id*. (emphasis added). The Court did not explicitly take issue with the more general "120 business days" but rather, that the timeframe was conditioned upon Gross's payment of attorney review time. Accordingly, we do not find *Parson* to be instructive here. And, as more fully explained in this opinion, we do not interpret section 610.023.3 as establishing an unalterable deadline for the production of the records.

17

Here, Werdehausen responded to Gross's first request with an "earliest time and date" of January 28, 2021, for the production of responsive documents. That date was only nine business days after receipt of Gross's request. Werdehausen subsequently informed Gross that the AGO would need additional time to "search for all records and review" them, and that the earliest it expected responsive records to be available was February 19, 2021. In the end, the AGO produced responsive records ahead of that date.

We view the general assembly's use of the term "earliest," together with "time and date" in section 610.023.3, as an admonition to public governmental bodies unable to grant access to public records within three business days of receipt of a sunshine request to provide the soonest date it anticipates being able to respond to the request. Consistent with the overarching purpose of the Sunshine Law to promote openness, public governmental bodies are duty-bound to diligently act to produce responsive records as quickly as possible. However, we do not read section 610.023.3 as imposing an unmovable deadline. The law is not written so inflexibly. Rather, when circumstances render, despite best efforts, a public governmental body unable to produce responsive records by the "earliest time and date" it has provided, the public governmental body is permitted to supply the requestor with an explanation for why additional time is needed and, based on a reasonable assessment of the attendant situation, a new "earliest time and date" the records will be ready for inspection. That is precisely what happened here. Point IV is denied.

In Point V, Gross argues that Werdehausen's "boilerplate and duplicative explanations were not detailed[]" as required by section 610.023.3 and complains that the

18

AGO "provided no affidavits or other evidence to support these explanations as being accurate or detailed."[14]

The summary judgment record established that the AGO explained to Gross that the delay in producing the records was "[d]ue to the dates and the volume of records to be searched[.]" Given the broad nature of Gross's first request, both in scope and timeframe, this explanation was reasonable and sufficiently detailed. *See e.g. Sansone v. Gov. of Mo.*, 648 S.W.3d 13, 28-29 (Mo. App. W.D. 2022) (the public governmental body's stated reason for its delay was that it was "in the process of reviewing" all five of the appellant's requests; that explanation was reasonable and sufficiently detailed).

Point V is denied.

### The AGO Properly Closed Records Pursuant to Section 610.021(1)
### (Points I, II, and III)

Points I, II, and III each concern Count I of Gross's petition accusing the AGO of improperly closing records responsive to his third request. That request sought:

> Emails, search records, and any other records showing how the Missouri Attorney General's Office searched for records and what locations the Missouri Attorney General's Office searched in response to the Sunshine Request dated January 11, 2021 sent by attorney [M.P.] on behalf of Elad Gross and the general public.

Werdehausen informed Gross that responsive records were closed under section 610.021(1).

---

[14] Gross forfeited his opportunity to contest the "accuracy" of Werdehausen's explanation when he failed to respond to the AGO's Motion for Summary Judgment. *See* Rule 74.04(c)(2) (failure to respond to a motion for summary judgment admits the truth of the uncontroverted material facts).

Gross contends in Point III that the "law provides that the [AGO] improperly closed records requested in [Gross's] third Sunshine Request." Point I asserts that the AGO had the burden to show compliance with Chapter 610, and failed to satisfy that burden because no evidentiary hearing was held. In Point II, Gross insists that the AGO was required to submit the documents responsive to his third request for *in camera* review in order to establish compliance with the Sunshine Law. With regard to these points, our task is to determine whether the Rule 74.04(c) record entitled the AGO to judgment as a matter of law on Count I of Gross's petition. We find that it did.

In an action seeking judicial enforcement of the Sunshine Law, the complaining party must establish that the public governmental body is subject to the Sunshine Law and that it "has held a closed meeting, record or vote[.]" § 610.027.2. Once this preliminary hurdle is met, "the burden of persuasion shall be on the [public governmental] body and its members to demonstrate compliance with the requirements" of Chapter 610. *Id*. It having been shown that the AGO is subject to the Sunshine Law and has closed records, the burden was on the AGO to establish that it complied with sections 610.010 to 610.026 in its closing of records responsive to the third request.

In the instant case, the AGO closed the records responsive to Gross's third request under section 610.021(1), which permits a public governmental body to close records related to "[l]egal actions, causes of action or litigation involving a public governmental body and any confidential or privileged communications between a public governmental body or its representatives and its attorneys." The reference to "[l]egal actions, causes of action or litigation" includes both pending and potential litigation. *See Tuft v. City of St.*

20

*Louis*, 936 S.W.2d 113, 118 (Mo. App. E.D. 1996). A "cause of action" is a "claim or general subject matter upon which an action may be maintained, and thus is not limited to cases in which a petition is filed." *Id*. at 117. "Where the justification offered is potential as opposed to pending litigation, the governmental body should properly bear a heavy burden of demonstrating both a substantial likelihood that litigation may occur and a clear nexus between the document sought and the anticipated litigation." *Id*. at 118.

## I. Substantial likelihood that litigation may occur

Gross argues that the "administrative search records" sought through his third request could not be closed under section 610.021(1) because he had not threatened litigation at the time of his third request. This assertion is not accurate. On February 23, 2021, ten days before the third request was submitted, Gross made statements on his Twitter account that accused the AGO of a "potential violation of public records laws[.]" He also published a twenty-page report, wherein he accused the AGO of withholding documents responsive to his first request. Thus, contrary to Gross's claim, the AGO closed records responsive to Gross's third request *after* he had explicitly "threatened litigation" over its handling of his first request.

The dissent does not dispute that Gross had threatened litigation over the AGO's processing of his first request prior to submitting his third request. However, the dissent asserts that the litigation landscape at the time a public governmental body receives a document request is of no consequence to the analysis because that is not the relevant moment in time. Instead, according to the dissent, the dye is forever cast on whether a document can be closed under the exemption found in section 610.021(1) at the time the

21

document is created. Under this view, a document can only be closed under section 610.021(1) if there exists a "substantial likelihood" of litigation when the document is created and the document is "created in whole or in part *because* of actual or [the] potential litigation."[15] The dissent essentially imposes a quasi-work product limitation to the reach of section 610.021(1).[16] No Missouri precedent makes such a declaration.[17]

Under section 610.021(1) the presence of a "substantial likelihood" of litigation is measured at the time of the document request and the AGO plainly met its burden of "demonstrating [] a substantial likelihood that litigation may occur[]" related to its compliance with chapter 610, RSMo, in responding to Gross's first request.

---

[15] The flaws in the dissent's approach are easily revealed. For example, under such a rule, a document created twenty years ago in the face of a "substantial likelihood" of litigation and having an undeniably "clear nexus" to that possible litigation would remain closed today despite the absence of any credible possibility of litigation. Conversely, a document created six months ago without any contemplation of possible litigation, would be *forever* open even if litigation was later initiated and the document went to the very core of that pending legal dispute.

[16] The dissent's effort to limit section 610.021(1) to documents created *because* of actual or potential litigation, is not consistent with the language of the provision. The relevant language only requires that the document "***relate to***…legal actions, causes of action or litigation involving a public governmental body[.]" *Id*. (emphasis added). A document can plainly "relate to" actual or potential litigation even if its creation was not directly instigated by that litigation.

[17] For instance, the dissent's reliance on *Weeks v. St. Louis County*, 696 S.W.3d 333 (Mo. banc 2024) is misplaced as it does not support its position that a document acquires its permanent status at the time of its creation. In *Weeks*, St. Louis County refused to disclose identifying serial numbers of individual police officers involved in particular traffic stops by arguing that the information could subject the officers to negative performance reviews or disciplinary action and was therefore closed under 610.021(3) (involving records relating to the "hiring, firing, disciplining or promoting of particular employees"). *Id*. at 342. The Supreme Court rejected this argument explaining that "the public governmental body must show the record in question relates directly to or has a clear nexus to the invoked exemption" and the county had only proffered a possibility that the officers could face employment action based upon their conduct reflected in the documents. *Id*. at 342. Significantly, the Supreme Court did not declare that the records could not be closed in the future if employment actions were initiated or substantially likely to be initiated against the officers.

## II. Clear nexus to the potential litigation

We next examine whether a clear nexus exists between the records sought through the third request and the threatened litigation. The necessary nexus is not derived from the identity of the individual requesting the record, but rather from the inherent nature of the record itself. *See Wyrick v. Henry*, 592 S.W.3d 47, 56-57 (Mo. App. W.D. 2019).

> [P]ublic records do not have a "clear nexus" to litigation merely because they could be relevant (that is, discoverable or admissible) in litigation threatened by a requesting party. Rather, when the focus is placed on the nature of the record itself . . . a "clear nexus" exists only in those narrow instances where the record by its inherent nature "relates to" pending or threatened litigation – a determination that is not influenced by the identity of the person making a Sunshine [Request], or by whether the public governmental body has been placed on notice of threatened litigation.

*Id.* at 57.

While several cases have addressed the reach of section 610.021(1) in a variety of scenarios, this case presents a unique question for which we have found no direct precedent – application of section 610.021(1) to records created by a public governmental body in responding to a previous Sunshine Request where the threatened litigation concerns the public governmental body's handling of that previous records request.

Upon receipt of a sunshine request, a public governmental body necessarily engages in a process designed to identify responsive documents. This process requires action by the public governmental body that may include (as it did here) the generation of new records that capture its efforts to comply with its legal obligations under chapter 610, RSMo. These records are created after receipt of a Sunshine Request, perform an integral role in shaping

23

the response to the request and, thus enjoy an inherent and clear nexus to the public governmental body's effort to satisfy its obligations under chapter 610, RSMo.

The records responsive to Gross's third request are such records. They were created *after* the AGO had received Gross's first request, reflect the methods employed by the AGO to respond to the first request, and reveal how it efforted to avoid litigation of the nature explicitly threatened by Gross prior to submission of his third request. The nature of these records rendered them not merely discoverable or admissible[18] in an enforcement action over the AGO's compliance with the Sunshine Law concerning its response to Gross's first request but go to the very core of such an action by disclosing the precise means utilized by the AGO to comply with its legal responsibilities. As a result, this is one of "those narrow instances where the record[s] by [their] inherent nature 'relate[] to'… [the] threatened litigation[.]"[19] *Wyrick*, 592 S.W.3d at 57. As a result, the AGO was entitled to close these records under section 610.021(1).

---

[18] "A record that is not by its inherent nature 'related to' litigation does not become so merely because it may be discoverable or admissible in litigation." *Wyrick v. Henry*, 592 S.W.3d 47, 57 (Mo. App. W.D. 2019). While we hold that the records sought in Gross's third request are subject to closure under section 610.021(1), the potential discoverability of those records in litigation is a separate question which is not addressed by this opinion.

[19] While this Court stated in *Wyrick* that "[a] record's inherent nature is a constant," the dissent goes awry when it concludes that a record's status as being "relate[d] to…legal actions, causes of action or litigation" is permanently forged at its creation. The dissent conflates a document's "inherent nature" with the existence of a "clear nexus" to the threatened litigation. These are separate and distinct concepts that operate independent of each other. In other words, a document's "inherent nature" may be established at its inception but whether that "inherent nature" has a "clear nexus" to active or potential litigation is a question decided at the time of the document request. In this instance, the "inherent nature" of the search records sought through Gross's third request is the means and methods utilized by the AGO to respond to his first request – the specific conduct that Gross threatened to bring litigation over.

24

Finally, we must address the dissent's claim that our finding—that these search records are closed—will result in "an open-ended application" to section 610.021(1) that would shield from public view any records that may relate to potential litigation. This assertion is unfounded. First, it is not enough that the public governmental body simply fears litigation will be brought; rather the public governmental body bears the "heavy burden" to establish that there exists a "substantial likelihood" that the litigation will commence. If that initial burden is satisfied, the public governmental body must next show that the inherent nature of the record at issue has a clear nexus to that litigation. This has been the legal standard since *Tuft* was decided 28 years ago and, here, it was met by the AGO.

Based on the Rule 74.04(c) record, the AGO carried its burden of showing compliance with the Sunshine Law in its handling of Gross's third request and the trial court properly granted summary judgment in its favor on Count I. Point III is denied. Moreover, since the summary judgment record established that the AGO was entitled to a judgment as a matter of law on Gross's claim that it had not complied with the Sunshine Law in its handling of his third request, no evidentiary hearing or *in camera* review was necessary.[20] Points I and II are also denied.

---

[20] Gross's arguments that the AGO was not entitled to summary judgment without an evidentiary hearing or *in camera* review of the documents reflects a miscomprehension of summary judgment practice. The failure by Gross to respond to the AGO's statement of uncontroverted facts rendered those facts admitted for purposes of evaluating the AGO's motion for summary judgment. Gross discounts the import of this result when he argues that, notwithstanding those admitted facts, the trial court was nevertheless required to conduct an evidentiary hearing and/or review the documents *in camera*. That is not how summary judgment works. Rather, if, as we have found, the uncontroverted facts established that the AGO was entitled to a judgment as a matter of law, no additional evidentiary effort is required.

25

Free Speech Retaliation Claim<br>(Point VI)

We now turn to Gross's assertion in Point VI that the trial court's entry of summary judgment on Count IV in favor of the AGO was erroneous. This count alleged that the AGO violated the Missouri Constitution's protection of free speech and prohibition of retaliation by closing records responsive to Gross's third request.[21] In this request, Gross asked the AGO to produce records of the means and methods used to search for the documents responsive to Gross's first request.

Having determined in our discussion of Points I through III that the AGO acted in compliance with the Sunshine Law with respect to its handling of Gross's third request, we reject the proposition that the AGO can be viewed as having "retaliated" against Gross in a constitutional sense by acting in a statutorily authorized manner. For these reasons, the trial court did not err in granting summary judgment in favor of the AGO on Count IV of Gross's petition. Point VI is denied.

**Conclusion**

For the foregoing reasons, we affirm the trial court's judgment.

_____
EDWARD R. ARDINI, JR., JUDGE

W. Douglas Thomson, Judge, concurs in the majority opinion
Alok Ahuja, Presiding Judge, dissents in a separate dissenting opinion

---

[21] In its briefing, the AGO questions whether a "retaliation" claim such as this is recognized in Missouri. Although we find nothing in our jurisprudence to indicate that Article I, Section 8 of the Missouri Constitution could serve as a pillar on which Gross's specific "retaliation" claim could stand, we need not resolve that question today.

26



# MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | |
|---|---|
| ELAD GROSS, | ) |
| | ) |
| Appellant, | ) |
| | ) |
| v. | ) WD87007 |
| | ) |
| ERIC SCHMITT, et al., | ) Filed: January 28, 2025 |
| | ) |
| Respondents. | ) |

## DISSENTING OPINION

Because I would reverse the circuit court's judgment in part, I respectfully dissent from the majority's across-the-board affirmance.

I agree with the majority's rejection of the bulk of Gross' claims. I disagree, however, with the majority's denial of Gross' third Point, which argues that the Attorney General violated the Sunshine Law when he refused to produce any records in response to Gross' third Sunshine request. Gross' third request asked for documents "showing how the Missouri Attorney General's Office searched for records" in response to one of Gross' *earlier* Sunshine requests.

The majority concludes that the Attorney General's Office properly closed all of its search-related records under § 610.021(1)²² ("Exemption 1"), because those records related to "[l]egal actions, causes of action or litigation involving a public governmental body . . . ." The majority reaches this result because, _after_ the Attorney General's Office had fully responded to Gross' first request, Gross threatened to sue the Attorney General over his purportedly inadequate response to that request. Contrary to the majority, I do not believe that records generated in responding to Gross' first Sunshine request could _become_ "relate[d] to . . . litigation" because of events occurring _after_ those documents were created. Moreover, although the majority emphasizes that the search records "go to the very core of" Gross' threatened lawsuit, that cannot justify invocation of Exemption 1, since we have explicitly held that documents are not "relate[d] to . . . litigation" simply because they may be _relevant_ – even _highly_ relevant – to threatened litigation. Instead, the _inherent nature_ of the records must bear a _clear nexus_ to actual or threatened litigation. Records which were created at a time when there was no substantial likelihood of litigation cannot be "relate[d] to . . . litigation" in the relevant sense.

The Attorney General separately contends that the search records fall within Exemption 1 because they constitute "legal work product." That argument

---

²² Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

fails, however, because the Attorney General made no showing that any of the records were created as part of an attorney's effort to prepare for future litigation.

## Discussion

The Missouri General Assembly has broadly declared that "[i]t is the public policy of this state that meetings, records, votes, actions, and deliberations of public governmental bodies be open to the public unless otherwise provided by law." § 610.011.1. Pursuant to this policy, the Sunshine Law specifies that "[p]ublic records shall be presumed to be open unless otherwise exempt pursuant to the provisions of this chapter." § 610.022.5. The legislature went further, and directed that the provisions of the Sunshine Law "shall be liberally construed and their exceptions strictly construed to promote th[e] public policy" favoring open government. § 610.011.1. As the Missouri Supreme Court only recently declared, "[t]his Court has long recognized section 610.011's command and has required the exemptions to disclosure in section 610.021 to be strictly construed to give effect to the public policy of the Sunshine Law." *Weeks v. St. Louis Cnty.*, 696 S.W.3d 333, 342 (Mo. 2024) (citation omitted).

Gross' third Point requires us to construe and apply one of the exceptions to the Sunshine Law's broad policy favoring the openness of governmental records. That exception, which I refer to as "Exemption 1," provides in relevant part:

> [A] public governmental body is authorized to close meetings, records and votes, to the extent they relate to . . .:

3

(1)  Legal actions, causes of action or litigation involving a public governmental body and any confidential or privileged communications between a public governmental body or its representatives and its attorneys.  . . .  Legal work product shall be considered a closed record . . . .

§ 610.021(1).

## I.

I cannot agree with the majority's conclusion that the Attorney General's Office adequately established that all of the documents responsive to Gross' third Sunshine request were "related to litigation."  The summary judgment record fails to show that the Attorney General's Office faced _any_ prospect of litigation at the time the documents responsive to Gross' third request were created; nor does the record provide any basis to conclude that the responsive documents were created, or their contents influenced, because of a prospect of litigation.  The best the majority can do is contend that the search records "go to the very core of" litigation which Gross threatened _later_.  That is not enough.

We construed Exemption 1 most recently in _Wyrick v. Henry_, 592 S.W.3d 47 (Mo. App. W.D. 2019).  In _Wyrick_, an individual was killed in a motor vehicle accident at an intersection in the City of Raytown.  The individual's heir later sent a notice of claim to the City pursuant to § 82.210, providing the particulars of the accident, and notifying the City that the heir "will claim damages therefor from" the City.  _Id._ at 51 n. 2. Six months after the heir's threat of litigation, the heir's attorney submitted a Sunshine request to the City.  The request sought the disclosure of records

4

pertaining to: "complaints about the safety of, or accidents occurring at or around," the relevant intersection; "the design of the intersection"; and "traffic or other diagnostic studies conducted at the intersection." *Id.* at 51. The requested records would have been highly relevant in any suit seeking damages against the City. Under § 537.600.1(2), the City could only be held liable for injuries "caused by the condition of [its] property" *if* the heir could prove that "the dangerous condition created a reasonably foreseeable risk of harm of the kind of injury which was incurred," *and* that

> either a negligent or wrongful act or omission of an employee of the public entity within the course of his employment created the dangerous condition or a public entity had actual or constructive notice of the dangerous condition in sufficient time prior to the injury to have taken measures to protect against the dangerous condition.

Any documents responsive to the heir's Sunshine request would be central to the litigation he had threatened, since they would show: the reasonable foreseeability of injury at the intersection; whether City employees created the dangerous condition; and whether the City had notice of the dangerous condition.

Thus, in *Wyrick*, the relevant records request was made when litigation had already been explicitly threatened; and the requested records went "to the very core of" the City's potential liability in that litigation. We nevertheless held that the requested records were *not* exempt from disclosure under Exemption 1. We explained:

5

On appeal, [the City Clerk] now argues that the records requested by Wyrick were "*related to*" litigation, and thus possessed [a] "clear nexus" to litigation . . ., because all of the records were relevant to establish one or more of the essential elements of the "dangerous condition" exception to sovereign immunity set forth in section 537.600(2). [The City Clerk] argues that "nexus" means a "connection between things," and the records requested "are the very type of documents *admitted as evidence* to demonstrate a waiver of sovereign immunity and liability for a dangerous condition on public property."

> [The City Clerk's] argument mistakenly conflates what is discoverable or admissible at trial with whether a public governmental body is excused from the mandatory obligation to disclose public records. ***A record that is not by its inherent nature "related to" litigation does not become so merely because it may be discoverable or admissible in litigation***. At its core, [the City Clerk's] argument is a mere recast of the now discredited argument that section 610.021(1) can be applied to close public records to a requesting party who has threatened litigation. [The City Clerk's] argument would permit public governmental bodies to rely on the litigation exception "as a basis for closing virtually any record" in a manner that would "be inconsistent with the requirement that exceptions to the [Sunshine Law] be strictly construed."
>
> We conclude that ***public records do not have a "clear nexus" to litigation merely because they could be relevant (that is, discoverable or admissible) in litigation threatened by a requesting party***. Rather, when the focus is placed on the nature of the record itself as required by section 610.021(1), a "clear nexus" exists only in those narrow instances where the record by its inherent nature "relates to" pending or threatened litigation – ***a determination that is not influenced by*** the identity of the person making a Sunshine Law, or by ***whether the public governmental body has been placed on notice of threatened litigation***.

*Wyrick*, 592 S.W.3d at 56-57 (emphasis added; citations omitted).

6

In light of *Wyrick*, the Attorney General's Office cannot rely on Exemption 1 to withhold the search records Gross sought in his third request. The Attorney General's Office has pointed to nothing in the inherent nature of those documents which was related to litigation, and it has pointed to no threat of litigation which existed at the time those records were created (on or prior to the Attorney General's final response to Gross' first request on February 18, 2021). It is not enough that the requested search records might be *relevant* in – or might even "go to the very core of" – any future lawsuit over the Attorney General's response to Gross' first request. As Gross argues, Exemption 1 is inapplicable here, because from all that appears from the summary-judgment record, "[t]he records [he] requested [we]re produced for the administrative purpose of searching for records and fulfilling the mandates of the Sunshine Law, not for the purpose of litigation."

The majority opinion quotes passages from *Wyrick*, but fails to heed the lessons that case teaches. Thus, although *Wyrick* explicitly says that the applicability of Exemption 1 "is not influenced by . . . whether the public governmental body has been placed on notice of threatened litigation," the majority holds that the litigation exception is applicable here because "the AGO closed records responsive to Gross's third request *after* he had explicitly 'threatened litigation' over its handling of his first request." If threats of litigation do "not influence[ ]" the application of Exemption 1, as *Wyrick* holds, why does

7

the majority rely on precisely such threats to justify application of the litigation exception here?

The majority proclaims that Exemption 1 applies, because the records Gross sought in his third request "go to the very core of" Gross' threatened lawsuit concerning the Attorney General's response to his first request. The majority assiduously avoids using words like "relevant," "admissible," or "probative" in describing the relationship between the search records and Gross' threatened lawsuit. But despite the majority's careful phrasing, its statement that the search records "go to the very core of" a threatened lawsuit is nothing more than a finding of relevance and admissibility. Yet *Wyrick* emphatically holds that "public records do not have a 'clear nexus' to litigation merely because they could be relevant (that is, discoverable or admissible) in litigation threatened by a requesting party." 592 S.W.3d at 57.

The majority opinion appears to hold that Exemption 1 is applicable because Gross' *Sunshine request* was "related to" the litigation he was threatening to bring. But it is not *the request* which must "relate to" litigation to invoke Exemption 1; *the records themselves* must "relate to" litigation. The *reasons* for Gross' third request are irrelevant.

As the majority acknowledges, in order to invoke Exemption 1 based on potential future litigation, "the governmental body should properly bear a heavy burden of demonstrating . . . a substantial likelihood that litigation may occur." *Tuft v. City of St. Louis*, 936 S.W.2d 113, 118 (Mo. App. E.D. 1996) (quoted in

8

*Wyrick*, 592 S.W.3d at 56). In finding a "substantial likelihood" of litigation here, the majority focuses on the wrong time period. The majority holds that the search records *became* "related to litigation" because of threats of litigation which Gross made *after the search records had been created.* The records responsive to Gross' third Sunshine request all necessarily pre-date February 18, 2021, since that is the date on which the Attorney General provided its final response to Gross' first request. Yet the *earliest* date on which the Attorney General's Office contends that Gross made a threat of litigation was five days <u>later</u> – on February 23, 2021.

Thus, the majority necessarily holds that the "inherent nature" of the requested search records *changed <u>after</u>* those records were created. But *Wyrick* forecloses the possibility that a public record's "inherent nature" could shift based on later threats of litigation. It holds:

> [S]ection 610.021(1) focuses on the inherent nature of the record itself by requiring a "clear nexus" between the record sought and actual or threatened litigation. ***A record's inherent nature is a constant***, divorced from the identity of the person requesting the record, and from whether a public governmental body has been placed on notice of possible litigation.

592 S.W.3d at 56 (emphasis added). If a record's inherent nature is "a constant," it must exist at the time the document is created, and cannot *change* based on later events. The majority's reliance on post-document-creation events, to characterize the documents' "inherent nature," cannot be squared with *Wyrick*.

9

Strictly construing Exemption 1, as required by § 610.011.1, that exception should only apply where records are created in whole or in part *because of* actual or potential litigation. Section 610.021(1) provides that records are subject to closure where they "relate to . . . litigation." The Supreme Court has construed the statutory phrase "related to" as requiring *some* causal connection between the relevant circumstances. In *Goings v. Missouri Department of Corrections*, 6 S.W.3d 906 (Mo. 1999), the Court interpreted what is now § 558.031.2, which provides that a criminal defendant sentenced to a term of incarceration is entitled to credit against their sentence for pretrial detention, "when the time in custody was related to that offense . . . ." In *Goings*, the Supreme Court held that time spent in custody by a defendant was "related to" a later offense, where the charging of the later offense led to the revocation of the defendant's parole for an earlier conviction. The Court explained that the later charge was "related to" the defendant's detention for the parole violation, because "[i]t was the [later] charge that resulted in revocation of his parole on his earlier" conviction. *Id.* at 908. Under *Goings*, "'[r]elated to' may be established where a subsequent offense is *one of the causes* of time in custody"; "*some causal relationship* between the inmate's time in custody and the offense must be established." *Pettis v. Mo. Dept. of Corr.*, 275 S.W.3d 313, 317 (Mo. App. W.D. 2008) (emphasis added; citations omitted).

Applying this precedent here, in order for particular records to be "relate[d] to . . . litigation," there must be *some* causal relationship between the

10

prospect of litigation and the creation or contents of the documents at issue. Here, however, the Attorney General's Office has identified _no_ litigation with which it was concerned at the time it responded to Gross' first Sunshine request. Because the summary judgment record does not establish that the search records were created because of the threat of litigation, or that their contents were influenced by the threat of litigation, the Attorney General has failed to establish a right to summary judgment under Exemption 1.

In *Tuft v. City of St. Louis*, 936 S.W.2d 113 (Mo. App. E.D. 1996), the Eastern District warned that,

> taken to extremes, virtually any controversial matter could be the subject of potential litigation and thus cited as a basis for closing virtually any record. Such an open ended application of the litigation exception would indeed be inconsistent with the requirement that exceptions to the Act be strictly construed. Where the justification offered is potential . . . litigation, the governmental body should properly bear a heavy burden of demonstrating both a substantial likelihood that litigation may occur and a clear nexus between the document sought and the anticipated litigation.

*Id.* at 118 (quoted in *Wyrick*, 592 S.W.3d at 56).

There are innumerable controversial programs and policies being implemented by our State government (including, *e.g.*, governmental regulation of education; gaming; cannabis; firearms; the environment; the electoral process; or abortion). As *Wyrick* holds, if a record is subject to closure under Exemption 1, it is subject to closure to _any_ requester. It is alarming to think that, under the majority's rationale, _all_ records concerning the implementation of such controversial government programs would be closed to _all_ Missouri citizens, and

11

to *all* journalists, because *anyone* had threatened litigation concerning the program's operation. The "open ended application" of Exemption 1 adopted by the majority, which authorizes the closure of any records which may "go to the very core of" litigation threatened after the records' creation, would result in precisely the sort of "extreme[ ]" consequences of which *Tuft* warned.

## II.

Although the majority does not address the issue, the Attorney General has separately contended that the records responsive to Gross' third request constitute "legal work product." As discussed above, however, the Attorney General's Office has pointed to no prospect of potential litigation which existed at the time it was processing Gross' first Sunshine request. Moreover, the Attorney General's Office has provided *no* details concerning the nature of any of the records it is witholding: who generated the responsive records; who had access to them; who requested their creation; or what subjects the records address. In these circumstances, a blanket claim of "legal work product" cannot be sustained.

"The work product doctrine is 'an intensely practical [doctrine], grounded in the realities of litigation in our adversary system.'" *Hill v. Wallach*, 661 S.W.3d 786, 791 (Mo. 2023) (quoting *U.S. v. Nobles*, 422 U.S. 225, 238 (1975)). "The work product privilege precludes an opposing party from discovering materials created or commissioned by counsel in preparation for possible litigation. In addition, it protects the thoughts and mental processes of the attorney preparing a case." *State ex rel. Ford Motor Co. v. Westbrooke*, 151 S.W.3d 364, 367 (Mo.

12

2004) (cleaned up); *see also State ex rel. Moore v. Brewster*, 116 S.W.3d 630,

638 (Mo. App. E.D. 2003).

To properly invoke the protection for work product, a party must provide

*some* information concerning the *nature* of the documents at issue, and the

*reasons* for the documents' creation.  In the context of the assertion of work

product protection for litigation discovery, our Court has explained:

> Blanket assertions of work product are insufficient to invoke
> protection.  In order to invoke work product protection, the party
> opposing discovery must establish, via competent evidence, that the
> materials sought to be protected (1) are documents or tangible
> things, (2) were prepared in anticipation of litigation or for trial, and
> (3) were prepared by or for a party or a representative of that party.
> "Competent evidence" may include a privilege log and affidavits from
> counsel.  The privilege log may identify documents individually or by
> categories if that provides sufficient clarity for the court to rule on
> the asserted privilege claim.  Limited discovery by deposition or
> otherwise regarding work product may be necessary.  Through this
> process, the parties develop a factual record from which the trial
> court can render an informed decision.

*State ex rel. Kilroy Was Here, LLC v. Moriarty*, 633 S.W.3d 406, 414-15 (Mo.

App. E.D. 2021) (cleaned up).

In this case, as discussed above, the Attorney General's Office has

identified _no_ litigation which was pending, or threatened, at the time it was

processing Gross' first Sunshine request.  That alone is fatal to its claim that _all_

search records constitute "legal work product."  But in addition, the Attorney

General's Office has provided _no_ information concerning the nature of the search

records it is closing.  There is no basis in the present summary-judgment record

to conclude that the search records Gross requested were "created or

13

commissioned by counsel in preparation for possible litigation." *Westbrooke*, 151 S.W.3d at 367

In *Gross v. Parson*, 624 S.W.3d 877 (Mo. 2021), like here, Gross propounded a Sunshine request to the Governor's Office, seeking records relating to its processing of one of his earlier Sunshine requests. Gross later contended that the Governor's Office had violated the Sunshine Law when it redacted portions of the responsive records. The Supreme Court held that Gross had stated a claim for a Sunshine Law violation. Notably, the Court rejected the Governor's claim that the redactions were justified to protect attorney-client privileged communications and attorney work product. The Court held that the Governor's claim of attorney-client privilege, and attorney work product, could only be assessed after development of the facts concerning the records' creation:

> [T]he Governor's Office says, "the second Sunshine [L]aw request clearly involved privileged and closed communications, since the requested documents involved multiple attorneys." The Governor's Office is correct that the Sunshine Law authorizes redaction in certain circumstances, such as for privileged attorney-client communication. But that general authorization does not mean the redaction that took place in this case was proper. Indeed, not every communication with an attorney is a privileged communication. "To be privileged the communication must relate to attorney-client business and not to extraneous matters." The Governor's Office was not entitled to judgment on the pleadings simply because it noted the Sunshine Law generally permits redaction of attorney-client privileged information. Whether redaction was proper here is a fact question that cannot be resolved on a motion for judgment on the pleadings.

*Id*. at 890 (citation omitted). Thus, the mere involvement of attorneys in responding to a Sunshine request does not make search records privileged,

14

without more information concerning the circumstances surrounding the records' creation.

The Attorney General's Office cites to a slew of federal district court cases which have refused to permit parties to engage in "discovery on discovery" – namely, discovery which seeks to explore the manner in which an adverse litigant responded to earlier discovery requests. But an opposing party's discovery efforts plainly "relate to litigation," and constitute attorney work product, because the earlier discovery efforts occurred _during_ the litigation itself. The "discovery on discovery" caselaw has no relevance here, where there was no litigation pending – or apparently, even anticipated – at the time the Attorney General's Office responded to Gross' first Sunshine request. I note that in a number of federal cases decided under the Freedom of Information Act ("FOIA"), courts have addressed requests for records relating to the government's processing of _earlier FOIA requests_, without ever suggesting that such "FOIA on FOIA" requests are inherently improper. _See, e.g._, _Machado Amadis v. U.S. Dep't of State_, 971 F.3d 364, 368-69 (D.C. Cir. 2020); _Shapiro v. U.S. Dep't of Justice_, 239 F. Supp. 3d 100, 112–13 (D.D.C. 2017); _Carlson v. U.S. Postal Serv._, 15-CV-06055-JCS, 2017 WL 3581136, at *17-*20 (N.D. Cal. Aug. 18, 2017).

_Even if_ the Attorney General's Office had made some showing that its efforts to respond to Gross' first Sunshine request were influenced by the prospect of litigation, it would face an additional obstacle: those documents were undeniably _also_ created for a non-litigation governmental purpose – to respond

to a citizen's request for records under the Sunshine Law.  Where documents may

serve "dual purposes" – namely, a litigation-related and a non-litigation-related

purpose – "[t]he focus is on whether specific materials were prepared in the

ordinary course of business, or were principally prompted by the prospect of

litigation."  8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE &

PROCEDURE § 2024 (3d ed. 2006) (footnotes omitted).

> In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used.  Dual purpose documents are deemed prepared because of litigation if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation."  In applying the "because of" standard, courts must consider the totality of the circumstances and determine whether the "'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.'"

*United States v. Richey*, 632 F.3d 559, 567–68 (9th Cir. 2011) (citations omitted);

*see also*, *e.g.*, *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 252-53 (4th Cir.

2023) (to justify work product protection, litigation must be "the 'driving force

behind the preparation of each requested document. . . .'" (citation omitted)).

In *Carlson v. United States Postal Service*, 15-CV-06055-JCS, 2017 WL

3581136 (N.D. Cal. Aug. 18, 2017), the Court applied this "dual purpose" doctrine

to a FOIA request seeking documents generated while responding to an earlier

FOIA request.  The Court concluded that work product protection was

inapplicable, because the relevant search records were "created in the normal

course of responding to [the requester's] FOIA requests and not 'because of'

16

anticipated litigation," and "would have been created in substantially the same form regardless of whether litigation was anticipated." *Id*. at *20.

In the present case, even if a prospect of litigation existed, and influenced the Attorney General's Office, at the time it responded to Gross' first Sunshine request, there has been no showing that the nature of the documents the Attorney General's Office created in that search were influenced by the prospect of litigation.

## Conclusion

For all of these reasons, I would reverse the circuit court's grant of summary judgment, to the extent that the court concluded that all documents responsive to Gross' third Sunshine request were protected from disclosure by § 610.021(1). To that extent, I respectfully dissent from the majority opinion.

_____
Alok Ahuja, Judge

17